The PEOPLE of the State of Colorado, Complainant

v.

Marc F. BENDINELLI, Respondent.

No. 13PDJ073.

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

May 19, 2014.

Following a disciplinary hearing, a Hearing Board suspended Marc F. Bendinelli (Attorney Registration Number 28425) for sixty-days, all stayed upon completion of a one-year period of probation with conditions. The probation took effect on June 23, 2014.

In the course of representing a client on a loss of consortium claim, Bendinelli failed to keep his client reasonably informed about the status of her case and failed to obtain her informed consent in writing to settle an aggregate claim. Bendinelli then signed his client's name to the settlement agreement without her authority and knowingly misrepresented the facts of her case with the intent that she rely upon those misrepresentations and agree to dismiss her claim that had already settled.

Through this conduct, Bendinelli violated Colo. RPC 1.2(a) (a lawyer must abide by the client's decisions concerning the objectives of a case and consult with the client regarding the means to achieve the objectives); Colo. RPC 1.4(a)(2) and (3) (an attorney shall reasonably consult with a client about the means by which the client's objectives are to be accomplished, and the attorney shall keep the client reasonably informed about the status of the client's matter); Colo. RPC 1.4(b) (a lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation); Colo. RPC 1.8(g) (an attorney shall obtain informed consent in writing when settling an aggregate claim); and Colo. RPC 8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation).

The Hearing Board could not find any clear and convincing evidence, however, that Bendinelli failed to verbally obtain his client's informed consent to settle her claim. Nor could the Hearing Board conclude that he engaged in dishonesty by settling her claim without her consent or by advising her that her claim was weak in violation of Colo. RPC 1.2(a), 1.4(b), and 8.4(c), as the People had alleged.

**OPINION AND DECISION IMPOSING SANCTIONS PURSUANT TO C.R.C.P. 251.19(b)**

From March 17 to 20, 2014, a Hearing Board comprising Douglas D. Piersel and

James X. Quinn, members of the bar, and WILLIAM R. LUCERO, the Presiding Disciplinary Judge ("the PDJ"), held a hearing pursuant to C.R.C.P. 251.18. Erin R. Kristofco appeared on behalf of the Office of Attorney Regulation Counsel ("the People"), and Marc F. Bendinelli ("Respondent") appeared with his counsel, Nancy L. Cohen. The Hearing Board now issues the following "Opinion and Decision Imposing Sanctions Pursuant to C.R.C.P. 251.19(b)."

## I. SUMMARY

Respondent engaged in misconduct while representing a client on a loss of consortium claim. He failed to keep his client reasonably informed about the status of her case and failed to obtain her informed consent in writing to settle an aggregate claim. He then signed his client's name to a settlement agreement without her authority and knowingly misrepresented the facts of her case, intending that she rely upon the misrepresentations and agree to dismiss a claim he had already settled. These actions violated Colo. RPC 1.2(a), 1.4(a)(2) and (3), 1.4(b), 1.8(g), and 8.4(c).

The Hearing Board determines, however, the People did not prove by clear and convincing evidence that Respondent failed to verbally obtain his client's informed consent to settle her claim in violation of Colo. RPC 1.2(a) and 1.4(b). We further find that the People were unable to prove a violation of Colo. RPC 8.4(c) based upon what they allege was Respondent's dishonesty in settling his client's claim without her consent or by advising her that her loss of consortium claim was weak. In light of the significant mitigating factors present here, the Hearing Board concludes that the appropriate sanction is a sixty-day suspension, all stayed upon the completion of a one-year period of probation with conditions.

## II. PROCEDURAL HISTORY

On September 17, 2013, the People filed a complaint against Respondent, alleging he violated Colo. RPC 1.2 (scope of representation), 1.4(a) and (b) (communication), 1.7(a)(2) (concurrent conflict of interest), 1.8(g) (aggregate settlement of two clients' claims), 1.15(c) (failure to provide an accounting), and 8.4(c) (conduct involving dishonesty, fraud, deceit, or misrepresentation). On October 18, 2013, Respondent answered the People's complaint. He contemporaneously filed, pursuant to C.R.C.P. 12(b)(5) and 251.15(a), a motion to dismiss Claim III, premised upon Colo. RPC 1.7(a)(2). The PDJ dismissed Claim III on December 10, 2013, but granted leave to amend the complaint with particularity. The People did not do so.

On November 20, 2013, the parties filed, and the PDJ granted, a protective order governing Respondent's confidential medical information. Respondent then filed a motion for judgment on the pleadings and a motion for partial summary judgment on February 4, 2014, asking the PDJ to strike paragraphs 105–107 from the People's complaint and to enter summary judgment on Claim V (Colo. RPC 1.15(c)) and paragraph 134. In their response to these motions, the People agreed to withdraw paragraphs 105–107 and 134 as well as to dismiss Claim V. The PDJ then struck paragraphs 105–107 from the complaint and dismissed Claim V. As a result, the hearing proceeded on Respondent's alleged violations of Colo. RPC 1.2, 1.4(a) and (b), 1.8(g), and 8.4(c).

On February 13, 2014, and February 26, 2014, respectively, the People filed motions to strike Dr. David S. Wahl's report and opinions and to strike his affidavit. The PDJ denied these motions, allowing Dr. Wahl to testify at trial.[1] Respondent next filed a motion in limine on March 10, 2014, seeking to preclude the People from introducing evidence of Respondent's alleged failure to timely disclose emails that were produced in his second and third supplemental disclosures and evidence of his alleged failure to disclose an email string that a third party produced to the People after the discovery deadline. The PDJ denied Respondent's motion on March 14, 2014, permitting the People to offer this evidence to refute Respondent's defense that his client was aware of a settlement offer, and finding the evidence

---

1. These motions and the PDJ's order are subject to the protective order and are thus confidential.

potentially relevant to certain aggravating factors.[2]

During the hearing on March 17–20, 2014, the PDJ directed the court reporter to seal portions of the transcript that contained testimony related to the protective order, including Respondent's opening statement, Dr. Wahl's testimony, Jonathan DeCarlo's testimony, and portions of Respondent's testimony. On April 3, 2014, Respondent withdrew his request to seal the transcript in this matter. Accordingly, the PDJ **UNSEALS** the portions of the transcript previously designated as confidential.

The Hearing Board heard testimony from the People's witnesses Andrea Peters, Mary Van Meter, Bruce McLarty, Sean Dormer, Adrian Sak,[3] and Laurie Seab[4] and rebuttal expert witnesses Bradley A. Levin and Dr. Hal Wortzel. We also heard testimony from Respondent and his witnesses Mark G. Mayberry and Jonathan DeCarlo[5] and expert witnesses William L. Keating and Dr. Wahl. The Hearing Board considered stipulated exhibits S–1 to S–43 and S–70; the People's exhibits 44–47, 52–53, 58, 64, and 67–69; and Respondent's exhibit A.[6]

At the close of the People's evidence, Respondent moved for a directed verdict, asserting that the People failed to present sufficient evidence to support the application of two aggravating factors: bad faith obstruction of the disciplinary proceeding and deceptive practices. Respondent also moved for a directed verdict on Claim VI (Colo. RPC 8.4(c)), limited to paragraphs 171–174 of the People's complaint. Respondent argued that the People should be precluded from asserting either aggravating factor during closing argument because of a lack of evidence presented and further asserted that the People did not prove that he engaged in dishonesty as alleged in paragraphs 171–174. For their part, the People maintained that the disciplinary rules do not permit directed verdicts and that they adduced sufficient evidence regarding these two aggravating factors and Claim VI to warrant the Hearing Board's review. In viewing the evidence in the light most favorable to the People, the PDJ denied Respondent's motion.

### III. FINDINGS OF FACT AND RULE VIOLATIONS

Respondent took the oath of admission and was admitted to the bar of the Colorado Supreme Court on September 15, 1997, under attorney registration number 28425.[7] He is thus subject to the jurisdiction of the Colorado Supreme Court and the Hearing Board in these disciplinary proceedings.[8]

### Findings of Fact

When Respondent moved to Denver in 1997, he started the Bendinelli Law Office ("BLO"). Today, BLO is a high-volume practice specializing in personal injury litigation. From 2010 to 2o13, Respondent handled personal injury cases exclusively. During that time, his caseload approached 130 prelitigation matters and approximately thirty-five litigation cases. Respondent assigned all pretrial litigation responsibilities to associates and litigation paralegals, who handled the discovery and took depositions, while Respondent tried the cases.

---

2. *See* American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) ("ABA *Standards* ") 9.22(e) (bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency); ABA *Standard* 9.22(f) (submission of false evidence, false statements, or other deceptive practices during the disciplinary process).

3. Sak testified for both the People and Respondent.

4. Seab was called by both the People and Respondent in their cases in chief.

5. DeCarlo was not qualified as an expert witness, and the PDJ limited DeCarlo's testimony to his observations as a treating therapist.

6. Exhibits 67–69 are audio files submitted on CD–ROM. Exhibit 46 was admitted for the limited purpose of demonstrating that it was never disclosed by Respondent. Exhibit 58 was admitted for the limited purpose of showing Respondent's lack of communication with his client.

7. Stip. Facts ¶¶ 1–2. Respondent's registered business address is 9035 Wadsworth Parkway, Suite 4000, Westminster, Colorado 80021. Stip. Facts ¶ 4.

8. *See* C.R.C.P. 251.1(b).

In 2008, Damien Peters, who was married to Andrea Peters, was injured in an automobile accident.[9] He retained BLO to represent him in his case against the other driver.[10] A contingency fee agreement was executed on March 18, 2008, by associate attorney Rebecca Albano and Mr. Peters.[11] This case settled for $25,000.00 in March 2010.[12]

Mr. and Ms. Peters had an uninsured/underinsured policy through American Family Insurance Company ("Am Fam").[13] Am Fam denied coverage for Mr. Peters's injuries, so BLO filed a lawsuit against the company.[14] In fall 2010, Ms. Peters met with Albano to discuss adding a loss of consortium derivative claim on her behalf in the suit against Am Fam.[15] On October 5, 2010, Ms. Peters signed a contingency fee agreement allowing BLO to proceed on a loss of consortium claim.[16] Ms. Peters testified that Albano told her the derivative claim would help prove her husband's case and, if they prevailed, would make their family whole, if not in a slightly better position than they were before the accident.[17]

Respondent testified that in late 2010, a convergence of unfortunate events occurred. While he was recovering from two back surgeries, he divorced his wife of twenty-four years. His mother, who was suffering from Alzheimer's, passed away a week after his divorce was finalized. Respondent also developed an addiction to pain medication that had been prescribed after his surgeries. As a result, two attorneys who had worked for BLO for over ten years resigned. These departures greatly affected Respondent. In June 2011, Respondent checked himself into a rehabilitation facility for substance abuse treatment. He remained there until August 2011, when he returned to Denver and began regular therapy with counselor Jonathan DeCarlo. Also during this time, Respondent was diagnosed with attention deficit disorder ("ADD") and depression. He began taking medication for these two conditions in August 2012.

Sometime in spring 2011, Albano, who had been handling the Peters case, left the firm. Between spring 2011 and spring 2012, Respondent testified, the case was handled primarily by associate attorneys Zach Wagner, Adrian Sak, and Martha Bohling. Litigation paralegal Mary Van Meter was also assigned to the case. Van Meter testified that she spoke often with Ms. Peters, sometimes as much as once a week. She characterized Ms. Peters as a very difficult client who frequently complained about Respondent, regularly screamed over the phone, and did not understand her case. Van Meter said that Ms. Peters repeatedly asked the same questions in the hope of getting the answer she wanted. Van Meter explained to Respondent her difficulty with Ms. Peters and asked him to "fire" her as a client; he eventually promised to do so.

Ms. Peters testified that in August 2011, she filed for divorce after pressing criminal assault charges against Mr. Peters.[18] Ms. Peters was represented by Warren J. Domangue in her divorce case. Ms. Peters indicated that she had never met Respondent before filing for divorce but attempted to contact him personally thereafter to discuss how her claim would proceed. She asserted that she received no response from Respondent, only speaking with him much later in 2012. In November 2011, Van Meter sched-

---

9. Stip. Facts ¶ 5.

10. Ex. S–1; Stip. Facts ¶ 6.

11. Ex. S–1.

12. Stip. Facts ¶ 7.

13. Ex. 44.

14. On February 23, 2011, Respondent filed a complaint on Mr. Peters's behalf against Am Fam for breach of contract and bad faith breach of contract. Ex. S–3.

15. See Ex. 64.

16. Ex. S–2; Stip. Facts ¶ 8. Albano signed this agreement on BLO's behalf.

17. On March 1, 2011, Respondent filed an amended complaint, adding Ms. Peters as a plaintiff and bringing her loss of consortium claim. Ex. S–4.

18. See Ex. 64.

uled a meeting with Ms. Peters to take place at BLO. This meeting did not occur.[19]

The trial in the Am Fam case was scheduled for July 2012. From May to June 2012, Respondent tried three back-to-back jury trials. While he was preparing for these trials, he assigned Sak and Wagner to handle the mediation in the Peters case set for May 30, 2012. Sak, Wagner, and Mr. Peters attended the mediation. Ms. Peters was not permitted to attend because she had a restraining order against Mr. Peters. The mediation was not successful. Ms. Peters never received a phone call from Respondent or anyone at BLO during the mediation or afterwards. On May 31, 2012, Ms. Peters called BLO, asking to speak with someone about her case, but was told that no one was available to speak with her.[20]

In June 2012, Respondent, Van Meter, and Bohling met with Ms. Peters at BLO. This was the first time Respondent met Ms. Peters in person.[21] Both Respondent and Van Meter testified that the original purpose of this meeting was to "fire" Ms. Peters as a client because she was difficult and, in their opinion, her loss of consortium claim was weak. Respondent testified that during the meeting he felt sorry for Ms. Peters and decided he wanted to assist her. Although he informed Ms. Peters that the outlook for her claim was not good, he did not discuss withdrawing her claim, nor in the end did he "fire" her.[22] Ms. Peters, however, left the meeting feeling that Respondent had belittled her and tried to make her feel like a bad person for asking about her case. She testified that she never really understood her claim and thought Respondent had mocked her. According to her, the meeting concluded with Respondent indicating that she would make a good witness at trial, but she did not have the impression that Respondent thought her claim was weak.

On July 11, 2012, Respondent received a $60,000.00 statutory offer of settlement releasing only Mr. Peters's claims.[23] Ms. Peters testified that no one at BLO informed her about this offer. Van Meter remembers that Respondent never instructed her to send Ms. Peters the offer.

Sak testified that the statutory offer was generous given the weaknesses of the Peterses' case.[24] On July 13 Respondent instructed Sak to make a $75,000.00 global offer of settlement to Am Fam.[25] Respondent admitted that he had not spoken with Ms. Peters by this date, but he was confident his clients would be happy with a higher offer.

Respondent testified that he finally spoke with Ms. Peters via telephone on July 16.[26] It was during this conversation that he claims he advised her of the $60,000.00 statutory offer and explained it was a very good offer. Respondent believed he received her authority to settle for at least this amount, if

19. Ms. Peters testified that she came to BLO for the November meeting and waited for over an hour, when she was told the meeting needed to be rescheduled. She cancelled a subsequent meeting. Van Meter recalls Ms. Peters cancelling at least three additional meetings.

20. Ex. 67.

21. *See* Ex. S–5.

22. Van Meter testified that Respondent did not withdraw from Ms. Peters's case as originally intended, because he liked her and believed her testimony would be helpful to the jury.

23. Ex. S–6. Bruce McLarty, one of Am Fam's attorneys, testified that Am Fam made an error by offering to settle only Mr. Peters's claims. A statutory offer of settlement remains open for fourteen days. C.R.S. § 13–17–202. A party may either accept or reject such an offer. *Id.* A party who rejects a statutory offer may be liable for costs if the party does not recover an amount in excess of the offer or prevail at trial. *Id.*

24. Sak testified that these weaknesses included a pending motion to dismiss Mr. Peters's claims for fraud, Mr. Peters's assault charges, and harmful deposition testimony by the Peterses indicating that the 2008 accident did not cause their marital strife.

25. *See* Ex. S–9.

26. Respondent does not have an independent recollection of the date of this phone conversation but looked at BLO's phone logs and believes he spoke with Ms. Peters on this day. *See* Ex. S–8 at BENDINELLI 006226 (BLO's phone logs indicating that a telephone call originating from Ms. Peters's phone was answered by a paralegal's extension on July 16, 2012, at 10:42 a.m.); *see also* Ex. S–70 (identifying the individuals assigned to specific BLO extensions and Ms. Peters's telephone number).

not more, during this conversation. He recalled Ms. Peters asking him how much money she would receive from the settlement. In contrast, Ms. Peters testified that she did not speak with Respondent around this time or give him authority to settle her claim. She said she did not receive any phone calls from anyone at BLO between July 11 and July 27, 2012. The Hearing Board carefully considered these differing accounts about Ms. Peters's verbal settlement authority and finds Respondent's testimony more credible than that of Ms. Peters.[27] The facts and circumstances also show by clear and convincing evidence that Respondent spoke with Ms. Peters during this period about settling her claim. As further explained below, during the relevant timeframe Ms. Peters never expressly contested Respondent's authority to settle her claim; moreover, her divorce lawyer—obviously aware of the settlement, if not the amount—continued to negotiate her settlement portion in the divorce proceedings.[28]

According to Sak, the entire case settled on July 19, 2012, for $65,000.00, after he verbally negotiated this amount with Bruce McLarty, a lawyer for Am Fam.[29] Sak stated that Respondent told him to accept this offer, and he believed Respondent had authority from the clients to settle for any amount over $60,000.00. On that same day, McLarty sent Wagner and Van Meter an email confirming the settlement and inquiring how the check should be written.[30]

Van Meter testified that around 3:00 p.m. on July 26 she entered Respondent's office and asked him who the payees should be on the settlement check. According to her, he replied that only Mr. Peters and BLO's trust account should be listed, specifically instructing her to leave Ms. Peters's name off the check.[31] Respondent remembered speaking with Van Meter but instead recalled telling her that it did not matter who was identified on the check. In his mind, his response was appropriate because clients do not sign settlement checks and the funds would be deposited immediately into BLO's trust account.[32] He never explained this concept to Ms. Peters. Around 4:25 p.m. that same day, Van Meter sent an email to McLarty that read: "Per Mr. Bendinelli, please address the check to Damien Peters and the Bendinelli Law Firm, PC, do not address the check to Andrea Peters." [33] We find no clear and convincing evidence as to who gave the final instruction to leave Ms. Peters's name off the settlement check, but we do find it is clear that Ms. Peters did not specifically make this request.[34]

According to Van Meter, on July 27 Respondent told her to email Ms. Peters and inform her that they would not be going to trial and that he would call her later to

27. *See People v. Distel,* 759 P.2d 654, 662 (Colo. 1988) ("[W]hen a hearing board acts as fact finder, it has the duty to assess the credibility of all the evidence before it, both controverted and uncontroverted.").

28. *See* Exs. 15 & 26.

29. *See* Ex. S–10.

30. Ex. S–10.

31. *See* Ex. S–11.

32. Van Meter and Respondent both testified that BLO's procedure after receiving a settlement check was to have Respondent endorse the check and then deposit it directly into BLO's trust account. An accounting, or settlement sheet, would then be provided to the client. Levin testified that the generally accepted practice is to place either all parties on the settlement check

along with the law firm or only the law firm. Keating stated, however, that because Respondent could have asked that the check be made out solely to his trust account or to both clients, it was not improper to have only one client named as a payee on the check. He testified that the practical result would be the same—the check would be deposited into the trust account.

33. Ex. S–11. Respondent was not included on these emails. Van Meter testified that she rarely copied Respondent on emails because he never checked his inbox.

34. We cannot fully endorse Van Meter's statement that Respondent told her who specifically should be listed as a payee on the settlement check. We have reason to believe, based on the testimony presented, that Van Meter may have given this instruction herself because she did not like Ms. Peters. This evidence calls into question whether Respondent told Van Meter to leave Ms. Peters off the check.

explain.[35] Respondent testified he wanted to explain to her what happens to a case after a settlement. Ms. Peters stated that when she received this email, she was very confused and did not understand why she was not going to trial. She called BLO twice that day to speak with someone about her case.[36] Ms. Peters spoke with Van Meter and was told Respondent would call her back later.[37] But Respondent never called Ms. Peters to explain the status of her case.

That same day, McLarty sent Wagner and Van Meter a copy of the settlement agreement and release.[38] The first paragraph contained the following language:

> For the consideration of the sum of SIXTY FIVE THOUSAND ($65,000.00) lawful money of the United States, paid on behalf of AMERICAN FAMILY INSURANCE COMPANY jointly to DAMIAN PETERS and the Bendinelli Law Firm, PC, the receipt and sufficiency of which is hereby acknowledged, *and for the further consideration of complying with ANDREA PETERS' specific request not to be included as a payee on the check for the above amount* .... [39]

Mr. Peters signed the agreement on July 27, but Respondent did not forward a copy of the agreement to Ms. Peters.[40] Also on that date, at 4:44 p.m., Domangue, Ms. Peters's divorce attorney, posted an email to the Colorado Trial Lawyers Association's ("CTLA") Listserv, which read:

> My client has not yet divorced husband.... *Husband had a pending P.I. case which settled this week for an as yet unknown amount.* Wife (my client) wanted to see contempt penalties against him, but my question is: can she get the amount he owes her directly from this settlement? If so, how is this done? *She*

*is a party to that case based on a loss of consortium claim*.... [41]

The facts set forth in this email are identical to those in Ms. Peters's case. Based on these facts, we conclude that Domangue was aware that Ms. Peters's case had recently settled. That Domangue, in his Listserv posting, did not raise as an issue that his client had not conferred authority to settle bolsters our conclusion above that Ms. Peters did in fact give Respondent permission to settle her claim. The Hearing Board finds Ms. Peters's testimony that she first learned of a settlement after July 27 during a telephone call with Van Meter to be incredible in light of Domangue's posting to the CTLA Listserv on July 27.

Ms. Peters received an email from Bohling on July 31, 2012, advising her that BLO needed her signed release to finalize the settlement and asking her to stop by the office.[42] The settlement release was not attached to the email.[43] Ms. Peters responded the next day, stating, "Hello Martha! could you please email me all the settlement the paper work, the full amount that was settled on. including lawyer fees. I would like to read through what I am signing to release." [44] In these emails, Ms. Peters does not protest that she never gave Respondent authority to settle her claim but rather expresses concern about the amount and substance of the settlement. She sent a second email to Bohling, again asking her to email "the documents that [she] requested earlier on the agreement of the settlement that was reached. I think that would be quicker." [45] As in the first email, Ms. Peters does not dispute Respondent's authority to settle.

Bohling finally sent Ms. Peters a copy of the unsigned settlement agreement on Au-

35. Ex. S–13.

36. Exs. 67–68 (recordings of phone calls from Ms. Peters on July 27, 2012, occurring at 12:08 p.m. and 4:30 p.m.).

37. Ex. 69.

38. Ex. S–11.

39. Ex. S–11 at PETERS–003932 (emphasis added).

40. Ex. S–21 at PETERS–006863.

41. Ex. S–15 (emphasis added).

42. Ex. S–16.

43. Ex. S–16.

44. Ex. S–17.

45. Ex. S–18.

gust 6.[46] Ms. Peters testified that she was very confused when she first read the agreement, particularly by the language in the first paragraph indicating she had specifically requested not to be included as a payee on the settlement check.[47] Van Meter recalls speaking on the phone the same day with Ms. Peters, who asked for an accounting. After her conversation with Ms. Peters, Van Meter entered Respondent's office with the unsigned settlement agreement. She informed Respondent that she did not think Ms. Peters would sign the settlement agreement because she felt her case had more value. Van Meter remembers him next "yanking" the agreement out of her hand, signing it, and giving it back to her. He then instructed her to send the signed agreement to Am Fam's counsel. Respondent had signed "Andrea Peters by atty" on Ms. Peters's signature block.[48]

Respondent asserted that it was proper for him to sign Ms. Peters's name because he thought the contingency fee agreement gave him this authority.[49] Respondent testified that he relied on section 2, which granted him any power of attorney necessary to handle settlements or verdict funds, and section 4, which granted Respondent a lien on monies recovered for attorney's fees and a security interest in medpay, uninsured, and liability benefits.[50] There is clear and convincing evidence that contradicts Respondent's arguments. The plain language of the power of attorney provision and the lien provision do not authorize Respondent to sign an agreement on behalf of his client, as both expert witnesses testified.[51]

Later that day, Van Meter emailed the fully executed settlement agreement to McLarty,[52] who was unwilling to accept the document with Respondent's signature. McLarty instead insisted on notarized signatures from both clients unless BLO could provide a valid power of attorney with Ms. Peters's notarized signature.[53] McLarty testified that he received no response from BLO until twenty-three days later, as described in detail below.

On August 17, Ms. Peters contacted Domangue and informed him that her signature on the agreement was "a fake."[54] Domangue then emailed McLarty and asked him for a copy of the signed agreement so that Ms. Peters could lodge a disciplinary complaint against Respondent.[55] Domangue did not dispute the settlement amount and continued to negotiate for Ms. Peters's share of the Am Fam settlement funds in the divorce action.[56]

Ms. Peters was sent a letter on August 24.[57] Ms. Peters stated that when she received this letter she was confused. Sean Dormer, a former BLO associate, testified that he was given an assignment by someone at BLO, at Respondent's direction, in August 2012; he was to research the elements of a loss of consortium claim and draft a letter to Ms. Peters explaining why her claim was not valid and should be dismissed. He called this a "shove-off letter." Understanding that the task was urgent, he completed it right away and sent Respondent a draft of the letter by email on August 23.[58]

In contrast, Respondent testified that the letter's timing puzzled him because by August 24, everyone was aware of the settlement. He thought this letter was sent in June, after Ms. Peters's deposition, because that is when he discussed with her the merits of her claim. Respondent also remembers giving Dormer this assignment before he

46. Ex. S–20.

47. Ex. S–22 at PETERS–003942.

48. Ex. S–21 at PETERS–006863.

49. *See* Ex. S–2.

50. Ex. S–2 at BENDINELLI000032–34.

51. *See* Ex. S–2.

52. Ex. S–28 at PETERS–007265.

53. Ex. S–28 at PETERS–007265.

54. Ex. S–24.

55. Ex. S–23.

56. *See* Ex. S–26.

57. Ex. S–27.

58. Ex. 53.

took time off to study for the July 2012 bar exam. Respondent did not remember reviewing, editing, or sending the letter in August.[59] Nevertheless, the final version of the letter, mailed with Respondent's signature on August 24, contained significant edits that reflected Respondent's style of writing.[60]

Even though Respondent testified that he was confused about why the letter was mailed on August 24, he sent an email to McLarty five days later on August 29, 2012, which reads:

> I left you a message on this.... There is no way to get ex-wife's signature as the parties no longer speak.
>
> *Out of an abundance of caution, and irrespective as to your and my communication, I sent [Ms. Peters] a letter explaining that we chose not to pursue a loss of consortium claim on her behalf.*[61]
>
> Further, I signed the release for her as counsel, which obligates my law firm and myself to any and all liability. Short of that, do you have any other suggestions?
>
> Either way, there is no way Am Fam would assume any liability by merely relying on my representations as her counsel. I truly believe that Am Fam bears no liability by accepting the release based on my signature.[62]

McLarty testified that he was "baffled" by this email and was unsure why BLO had elected not to pursue Ms. Peters's claim, given that a global settlement had already been reached. Respondent never contacted him to clear up the misunderstanding. Respondent explained that, not knowing what else to do, he emailed McLarty that he would be assuming all liability for signing the release. After considering the totality of the evidence and testimony presented, we conclude that Respondent meant for the letter to be sent in August.

On September 19, 2012, Am Fam filed a motion to enforce the settlement with the trial court. In that pleading, Am Fam stated that Domangue had contacted its attorneys asking them to hold the settlement funds, and that Ms. Peters had also contacted them because she had not signed the settlement agreement and wanted them to hold the funds.[63]

Respondent partially joined in this motion on September 20, 2012.[64] He signed the motion on behalf of both clients. Nevertheless, the motion indicates that Ms. Peters was demanding an amount that exceeded the settlement, preventing Respondent from bringing the clients to a mutual decision regarding distribution of the funds.[65] Respondent admits that he did not speak with Ms. Peters before filing this motion.

On October 3, 2012, Ms. Peters filed a pro se pleading with the trial court, stating in relevant part:

> My attorney is Marc Bendinelli but he has made false statements about me in his partial joinder.....
>
> [Respondent] says that I 'demand an amount that exceeds the amount of the settlement remaining after payment of Damian Peters' medical bills." [T]his is not true. I am only demanding my portion of the settlement after expenses and fees. I did not know what those amounts were at the time I tried to settle my divorce case.
>
> [Respondent] never asked if I agreed to the amount he settled this case for. He only asked that I sign a release that falsely stated that they were "complying with Andrea Peters' specific request not to be included as a payee on the check for the above amount." I have never requested

---

59. Respondent did not contest at the disciplinary hearing that the letter was mailed on August 24, 2012. He testified that on this date the letter likely was within a stack of many letters in final form on his desk, all of which he signed without reviewing and gave to his secretary to mail out.

60. *Compare* Ex. 53 *with* Ex. S–27.

61. Respondent explained that when he sent the email to McLarty, he was referencing the August

24 letter to Ms. Peters, which he thought had actually been mailed in June.

62. Ex. S–28 (emphasis added).

63. Ex. S–29.

64. Ex. S–30.

65. Ex. S–30.

that I not be included as a payee on the settlement check.[66]

The trial court granted Am Fam's motion to enforce the settlement on October 3, 2012.[67] Am Fam then deposited the $65,000.00 into the trial court's registry.[68] On October 15, 2012, Respondent filed a notice of attorney lien for $40,482.51 against the Peterses' contingency fee agreements,[69] and four days later, he filed a motion to disburse the funds from the trial court's registry.[70] Respondent withdrew as Ms. Peters's counsel on February 27, 2013.[71] At the time of the disciplinary hearing, the settlement money remained in the court's registry. Respondent eventually returned his attorney's fees for Mr. Peters's 2008 personal injury litigation and waived his fees for the Am Fam lawsuit.

## Scope of Representation (Colo. RPC 1.2(a))

■ The People contend in Claim I that Respondent violated Colo. RPC 1.2(a), which requires a lawyer to abide by the client's decisions concerning the objectives of a case and to consult with the client regarding the means to achieve the objectives. This rule also mandates that a lawyer abide by the client's choice to settle a case.[72] The People assert Respondent violated this rule by failing to obtain Ms. Peters's authority to settle her claim and by failing to consult with her regarding the settlement agreement. They also aver that Respondent violated this rule when he signed Ms. Peters's name to the settlement release when he knew she had not seen it or agreed to it. In defense, Respondent insists that he received verbal settlement authority from Ms. Peters on July 16, 2012, and that the fee agreement granted him authority to sign the settlement release.

The Hearing Board concludes that the People did not prove by clear and convincing evidence that Respondent lacked verbal au-

thority from Ms. Peters to settle her claim. Looking at the totality of the evidence presented, we find that Respondent received verbal authority from Ms. Peters to settle her claim for at least $60,000.00 on July 16, 2012. Respondent offered credible testimony that he spoke with Ms. Peters on that day about Am Fam's initial statutory offer and that he received her verbal authority to settle for more than $60,000.00 during this conversation. BLO's phone records confirm that a phone conversation with Ms. Peters took place on that day. Ms. Peters's testimony that she was unaware of the settlement is not credible, especially in light of Domangue's posting to the CTLA Listserv on July 27, which shows he was aware the Am Fam case had settled the same week. The logical inference is that Ms. Peters informed Domangue of the settlement after speaking with Respondent on July 16, 2012.

Equally revealing are Ms. Peters's emails to Bohling and her pro se pleading filed with the trial court. Ms. Peters never told Respondent that he did not have authority to make a settlement offer to Am Fam. Rather, she focused on the amount of the final settlement and her portion of these funds. These contemporaneous communications belie her adamant testimony at the disciplinary hearing that she never gave Respondent authority to settle. Accordingly, we conclude the People failed to meet their burden of clearly and convincingly demonstrating that Respondent violated Colo. RPC 1.2(a) by failing to consult with Ms. Peters about the settlement offer and by settling her claim without authorization.

However, the Hearing Board finds that by signing the settlement release without first consulting Ms. Peters—when he knew she had not requested her name be left off the settlement check—Respondent violated this rule. At the time Respondent signed the release, he was aware that Ms. Peters has refused to sign it. He also knew that she

---

66. Ex. S–33. Ms. Peters testified that Domangue assisted her in writing her pro se statement.

67. Ex. S–31.

68. Ex. S–37.

69. Ex. S–34.

70. Ex. S–35.

71. Ex. S–36.

72. Colo. RPC 1.2 cmt. 1.

had not given him permission to sign the settlement document on her behalf. Instead of consulting with her, he signed the agreement "Andrea Peters by atty" and directed Van Meter to send the executed release to Am Fam. This conduct violated Colo. RPC 1.2(a).

### Communication (Colo. RPC 1.4(a) and (b))

█ The People's second claim is based in part on Colo. RPC 1.4(a)(2) and (3), which require, respectively, that an attorney reasonably consult with a client about the means by which the client's objectives are to be accomplished and that the attorney keep the client reasonably informed about the status of the client's matter.[73] Claim II is also premised upon Colo. RPC 1.4(b), which requires a lawyer to explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

First, the People argue that Respondent violated Colo. RPC 1.4(a)(2) when he failed to consult with Ms. Peters about the Am Fam statutory settlement offer and settled her claim without her authority. They further allege that he violated Colo. RPC 1.4(a)(3) when he did not tell Ms. Peters about either of Am Fam's offers until after he had settled all of the claims and when he failed to inform her of the substance of the settlement until August 6, 2012. Respondent's overall failure to maintain minimum communications with Ms. Peters over an extended period also violated this rule, according to the People.

Respondent admitted at the hearing that he did not communicate reasonably with Ms. Peters from July to August 2012 in violation of Colo. RPC 1.4. We agree that his general lack of communication during this period violated this rule. Respondent did not return Ms. Peters's phone calls on May 31, 2012; in fact, he did not speak with her until the meeting at the end of June. He then did not communicate with her again until July 16, 2012. After the case had settled, Respondent did not inform Ms. Peters that she had been left off the settlement check. And once he realized she would not execute the settlement agreement, he signed the agreement on her behalf without permission rather than reaching out to her. He should have explained to Ms. Peters why she needed to sign the agreement and discussed with her the practical effect of not listing her name on the settlement check. These failures to communicate violated Colo. RPC 1.4(a)(2) and (3).

Additionally, Respondent's "shove-off" letter of August 24, attempting to convince Ms. Peters to dismiss her loss of consortium claim after the case had been settled, did not comport with his duties under Colo. RPC 1.4(a)(2) and (3). Further, even though he still represented Ms. Peters, he admittedly did not consult with her before filing the partial joinder to enforce the settlement and the motion to disburse settlement funds, nor did he discuss with her the contents of either motion.[74] Given the circumstances, he should have explained to her why he was filing these pleadings. Likewise, Respondent should have ensured that his associate attorneys were keeping Ms. Peters informed about her case during this time.[75] He did not instruct Sak or Wagner to contact Ms. Peters after the mediation on May 30, 2012, and Ms. Peters did not receive the settlement documents from Bohling until August

---

**73.** Since filing the complaint, the People appear to have narrowed the factual allegations forming the basis of their Colo. RPC 1.4(a) claim. See People's Hr'g Brief at 6 (alleging a violation of Colo. RPC 1.4(a)(2) and (3)). In their complaint, the People allege that Respondent's violations of Colo. RPC 1.4(a) constituted abandonment of Ms. Peters's case. Although Respondent failed in many respects to communicate reasonably with Ms. Peters, we do not find that he abandoned her case because he did not neglect the matter.

**74.** See In re Pankowski, No. 575,2007, 2007 WL 4245472, at *4 (Del.Supr. Nov. 9, 2007) (finding a violation of Del. RPC 1.2(a) and 1.4(a) where an attorney failed to consult with a client about the contents of a pleading, signing the client's name to the pleading and filing it with the family court without the client's approval).

**75.** See Colo. RPC 1.4 cmt. 4 ("When a client makes a reasonable request for information, however, paragraph (a)(4) requires prompt compliance with this request, or if a prompt response is not feasible, that the lawyer or a member of the lawyer's staff acknowledge receipt of the request and advise the client when a response may be expected.").

6, 2012, weeks after the case had settled. Through these actions, Respondent violated Colo. RPC 1.4(a)(2) and (3).

■ The People contend that Respondent violated Colo. RPC 1.4(b) by failing to explain to Ms. Peters the implications of the statutory offer of settlement in order to permit her to make an informed decision about settlement. As we found with Claim I above, the Hearing Board concludes that the People have failed to prove that Respondent did not have Ms. Peters's authorization to settle her claim or that he neglected to explain to her Am Fam's offers and the implications of each. Accordingly, we conclude the People failed to meet their burden of demonstrating by clear and convincing evidence that Respondent violated Colo. RPC 1.4(b) on these grounds. But we do find that Respondent violated Colo. RPC 1.4(b) in his August 24 letter to Ms. Peters when he provided inaccurate information about the status of her case and when he urged her to dismiss her claim, suggesting that she still had the opportunity to dismiss her claim after the case had settled.[76] As a result, she was precluded from making an informed decision on this issue.

### Aggregate Settlement of Two Clients' Claims (Colo. RPC 1.8(g))

In their Claim IV, the People allege Respondent violated Colo. RPC 1.8(g), which requires an attorney to obtain informed consent in writing when settling an aggregate claim. It is undisputed that Respondent was attempting to settle both of the Peterses' claims in the Am Fam lawsuit. Thus, he needed to obtain their informed consent in writing. Respondent conceded, and the Hearing Board finds, that he violated this rule.

### Conduct Involving Dishonesty, Fraud, Deceit, or Misrepresentation (Colo. RPC 8.4(c))

■ The People's sixth claim is based on Colo. RPC 8.4(c), which proscribes dishonest conduct. In order to prove a violation of this rule, it must be shown that the lawyer possessed a mental state greater than simple negligence. The People list several ways in which they believe Respondent violated this rule: by telling McLarty that the Peterses had agreed to settle the case for $65,000.00; by settling the case without Ms. Peters's consent; by signing Ms. Peters's name on the settlement agreement, knowing that she had not agreed to its terms; by telling Ms. Peters that her claim was weak; and by sending Ms. Peters the August 24 letter encouraging her to dismiss her claim.[77] Respondent defends his actions by insisting that he had Ms. Peters's authority to settle her case and that the fee agreement gave him authority to sign the release. He also contends that the August 24 letter was not dishonest but merely confusing due to its timing, and he admits he should have taken the time to review it before it was sent to Ms. Peters.

The Hearing Board concludes the People have failed to prove that Respondent engaged in dishonest conduct by telling McLarty that both clients had agreed to settle or by settling Ms. Peters's claim. The reasoning as set forth in Claim I governs our determination here, and thus we do not repeat it.

We do, however, find that Respondent engaged in dishonest conduct when he knowingly misrepresented the status of Ms. Peters's case in the August 24 letter in order to convince her to dismiss her claim. Although his legal opinions were accurate, sending the

---

76. *See In re Haines,* 177 P.3d 1239, 1251 (Colo. 2008) (affirming a hearing board's determination that an attorney violated Colo. RPC 1.4(b) where she failed to adequately explain to her client how withdrawing substantial administrative fees would affect an estate); *Attorney Grievance Comm'n v. Snyder,* 368 Md. 242, 793 A.2d 515, 532 (2002) (finding a violation of MRPC 1.4 where a lawyer failed to explain the implications of a DWI case adequately to a client, incorrectly advising her that she need not appear in court, resulting in her arrest and depriving her of the

ability to make an informed decision about her case).

77. Although the People allege in their complaint that Respondent was dishonest by recording phone calls between his clients and BLO, the People did not address the contention in their hearing brief nor did they offer argument during the hearing on this claim. Therefore, we do not address this allegation.

letter was deceitful.[78] The case had settled, yet Respondent could not persuade Ms. Peters to sign the release. He therefore tried to manipulate her into dismissing her claim so he could move forward with the settlement. He knew that dismissing her claim at that stage of the litigation was improper, yet he sent the letter. He then acknowledged his dishonesty in the email he sent to McLarty five days later in which he told McLarty that Ms. Peters would not sign the release and that he had sent her a letter asking her to dismiss her claim. Accordingly, we conclude that the People have proved a knowing violation of Colo. RPC 8.4(c).

Finally, we conclude that Respondent knowingly contravened Colo. RPC 8.4(c) by signing Ms. Peters's name on the settlement release when he knew Ms. Peters had refused to sign it.[79] This dishonest act also deceived McLarty and Am Fam by leading them to believe that Respondent had the authority to sign her name when in fact he did not.

## IV. SANCTIONS

█ The American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) ("ABA *Standards*") and Colorado Supreme Court case law guide the imposition of sanctions for lawyer misconduct.[80] In imposing a sanction after a finding of lawyer misconduct, the Hearing Board must consider the duty violated, the lawyer's mental state, and the actual or potential injury caused by the lawyer's misconduct. These three variables yield a presumptive sanction that may be adjusted in consideration of aggravating and mitigating factors.

### ABA *Standard* 3.0—Duty, Mental State, and Injury

*Duty:* By engaging in dishonest conduct, neglecting to diligently communicate with Ms. Peters during summer 2012, failing to get her informed consent in writing, and signing the settlement release without first consulting her, Respondent violated duties he owed to his client.

*Mental State:* Respondent acted knowingly when he sent the August 24 letter to Ms. Peters, intending that she rely on his advice and agree to dismiss her claim.[81] He also acted knowingly when he failed to get Ms. Peters's informed consent to settle in writing and when he signed the settlement release on her behalf without her consent. From June to August 2012, Respondent was negligent in failing to communicate with Ms. Peters when he did not return her phone calls, explain her case to her in a reasonable manner, or reach out to her once he learned she would not sign the settlement release.

*Injury:* Critical to the attorney-client relationship is the client's trust in the attorney. An attorney is trusted to give proper legal advice, and clients rely upon such advice. Ms. Peters suffered actual injury in that Respondent's failures to communicate and dishonest conduct—signing his name to the settlement agreement and sending her the August 24 letter—contributed to Ms. Peters's lack of trust in Respondent. Furthermore, had Ms. Peters relied upon Respondent's advice given in the August 24 letter and agreed to dismiss her claim, she might have lost any entitlement to the Am Fam settlement funds.

78. We do not adopt the People's position that Respondent acted dishonestly when he told Ms. Peters that her loss of consortium claim was weak. We accept Keating's testimony that if an attorney believes a client's claim lacks merit, the attorney has an obligation to be honest with the client about that opinion.

79. *See, e.g., In re Disciplinary Action against Grigsby*, 815 N.W.2d 836, 843 (Minn.2012) (finding a violation of Minn. RPC 8.4(c) where an attorney signed his client's name to a court document without authorization); *In re Riggs*, 664 N.W.2d 290, 290 (Minn.2003) (approving a stipu-lation and finding a violation of Minn. RPC 8.4(c) where an attorney signed his client's name to an affidavit without the client's knowledge but without an intent to defraud).

80. *See In re Roose*, 69 P.3d 43, 46–47 (Colo. 2003).

81. A knowing state of mind is defined as "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective to accomplish a particular result." ABA *Standards* § III at 9.

## ABA *Standards* 4.0–7.0—Presumptive Sanction

ABA *Standard* 4.62 provides for suspension where a lawyer knowingly deceives a client and causes injury or potential injury to the client.[82] ABA *Standard* 4.43 calls for a public censure when a lawyer is negligent and does not act with reasonable diligence in representing the client, thereby causing injury or potential injury to the client.[83] Where multiple instances of attorney misconduct have occurred, the ABA *Standards* counsel that the ultimate sanction should at least be consistent with the sanction for the most serious disciplinary violation and generally should be greater than the sanction for the most serious misconduct.[84] Thus, we begin our analysis with suspension as the presumptive sanction.

## ABA *Standard* 9.0—Aggravating and Mitigating Factors

■ Aggravating factors are considerations or circumstances that may justify an increase in the presumptive discipline to be imposed, while mitigating factors may warrant a reduction in the severity of the sanction.[85] The Hearing Board considers evidence of the following aggravating and mitigating circumstances in deciding the appropriate sanction.

*Dishonest or Selfish Motive—9.22(b):* Respondent acted with self-interest when he sent the August 24 letter to Ms. Peters and when he signed the settlement agreement without any authority to do so. In taking these actions, he was furthering his own goal to finalize the settlement and arrange for distribution of his attorney's fees, even though he knew Ms. Peters had refused to sign the release. We find sufficient evidence of a selfish motive to apply this factor in aggravation.

*Multiple Offenses—9.22(d):* Respondent engaged in different types of misconduct on multiple occasions in violation of Colo. RPC 1.2(a), 1.4(a) and (b), 1.8(g), and 8.4(c). We therefore apply this factor in aggravation.

*Bad Faith Obstruction of the Disciplinary Proceeding by Intentionally Failing to Comply with Rules or Orders of the Disciplinary Agency—9.22(e):* The People assert that Respondent acted in bad faith by intentionally failing to initially disclose emails that were eventually produced in his second and third supplemental disclosures and by failing to disclose an email string that a third party produced to the People on February 27, 2014. We do not find that Respondent intentionally failed to comply with the rules of discovery for two reasons. First, the People's investigator Laurie Seab testified that the People received Respondent's second and third supplemental disclosures before the discovery cutoff date and that those disclosures contained the disputed emails. Second, Seab confirmed that Respondent agreed to be deposed again so the People could question him about the emails. His second deposition was ultimately cancelled by the People.

The People further aver that Respondent acted in bad faith by not giving BLO's information technology employee ("IT") clear instructions to search every computer for emails with the subject line "Peters" during the discovery process. According to the People, had he done so, he would have been able to produce the email discovered in February 2014. Respondent testified that he did not give specific instructions to IT other than to cooperate with his attorney. He believed that IT was doing what was necessary to locate all discoverable information. The People did not present evidence that Respondent intentionally withheld the email discovered in February 2014 or directed IT to do so. The Hearing Board therefore determines it was

---

82. Although Appendix 1 to the ABA *Standards* suggests that violations of Colo. RPC 8.4(c) represent a breach of a duty owed to clients or to the public under ABA *Standards* 4.6 or 5.1, we find Respondent's misconduct here is properly considered as a breach of his duty to his client under ABA *Standard* 4.6.

83. ABA *Standard* 4.3 (failure to avoid conflicts of interest) generally governs violations of Colo. RPC 1.8(g); however, we find ABA *Standard* 4.43 more applicable under the circumstances because ABA *Standard* 4.3 speaks directly to a conflict of interest between two clients, and the People did not pursue a conflict of interest claim.

84. ABA *Standards* § 2 at 7.

85. *See* ABA *Standards* 9.21 & 9.31.

reasonable for Respondent to rely upon IT's technical expertise to gather the relevant electronic discovery and does not find evidence of bad faith on Respondent's part. We do not apply this factor in aggravation.

*Submission of False Evidence, False Statements, or Other Deceptive Practices During the Disciplinary Process—9.22(f):* The People argue that Respondent engaged in deceptive practices when Seab interviewed him before the formal complaint was filed. Seab testified that during the interview, she questioned Respondent about the August 24 letter he sent to Ms. Peters. Seab stated that Respondent did not remember why he sent the letter but rather said that it was a mistake to send it. The People aver that Respondent's testimony at the hearing—that he was confused by the letter—indicates that he lied to Seab during the interview. The Hearing Board does not agree: Respondent's answers during the interview and disciplinary hearing were substantially similar. We therefore do not apply this factor in aggravation.

*Refusal to Acknowledge Wrongful Nature of Conduct—9.22(g):* The People ask us to apply this factor in aggravation, but we do not find that Respondent has refused to acknowledge the wrongful nature of his misconduct. In fact, he waived his attorney's fees in the Am Fam litigation, which totaled approximately $40,000.00.[86] He then returned the fees he had earned in Mr. Peters's 2008 personal injury action. Respondent also offered credible testimony that he understood why Ms. Peters was upset that her name had been left off the settlement check and that Respondent had signed her name on the settlement agreement. He also admitted at the hearing that he violated Colo. RPC 1.4(a) and 1.8(g). We decline to consider this as an aggravating factor.

*Substantial Experience in the Practice of Law—9.22(i):* Respondent was admitted to the bar in 1997. His misconduct reflects poorly on such a longstanding practitioner. Therefore, we apply this factor in aggravation.

*Absence of Prior Disciplinary Record—9.32(a):* Respondent has been practicing law since 1997 with no instances of discipline. We apply this factor in mitigation.

*Personal or Emotional Problems—9.32(c):* Although the People emphasize that Respondent did not mention any personal or emotional problems during his initial interview, we find sufficient evidence was presented to weigh this factor in mitigation. We heard testimony from Respondent's colleagues about his scattered work habits during summer 2012, including his inability to focus, forgetfulness, lack of organization, and ADD.

Respondent also offered testimony about events occurring in 2010 and 2011, including his mother's death, his divorce, and his substance abuse. He believes that he abused prescription medication because he was experiencing emotional pain. His substance abuse caused two trusted associates to leave BLO, which greatly affected both him and the firm. He then voluntarily entered a rehabilitation facility in July 2011, which included thirty days of detoxification. When he returned to the firm, the two associates had left and the firm was extremely busy. Respondent testified that he has remained sober since leaving the rehabilitation center. Soon thereafter, he was diagnosed with depression and ADD, but he did not receive medication for either condition until August 2012.

He began regular therapy with Jonathan DeCarlo after leaving the treatment facility to process his grief regarding his divorce and his mother's death. DeCarlo started treating Respondent weekly in August 2011 and then every other week from May 2012 to the present. When DeCarlo first met Respondent in 2011, he observed that Respondent was open and honest but disorganized, distracted, and emotionally vulnerable. Time management was an issue for Respondent, according to DeCarlo, and he often required direction. From May to June 2012, when Respondent tried three back-to-back jury trials, DeCarlo observed Respondent to be focused and prepared. But after the conclusion of the three trials, DeCarlo characterized Respondent as emotionally spent and

---

86. *See* Ex. S–35.

vulnerable, which caused his level of distraction to increase. He noted that Respondent experienced difficulty in letting his emotions direct his actions. DeCarlo opined that during this time, Respondent was "emotionally dysregulated," experienced mood swings, and was anxious and depressed.

DeCarlo, as of late, has witnessed substantial changes in Respondent's focus, attention, and alertness. He said he believes that today Respondent is emotionally present and responsive and that he has resolved the emotional issues stemming from his divorce and his mother's death. Overall, DeCarlo has seen marked progress in the past year and a half: Respondent has been sober since August 2011, is employing more effective time management and communication techniques, and continues to participate in twelve-step programs and service work. He also stated that Respondent intends to continue regular treatment with him.

*Timely Good Faith Effort to Make Restitution or Rectify Consequences of Misconduct—9.32(d):* Respondent asks us to apply this factor in mitigation because he waived and returned the Peterses' attorney's fees. The Hearing Board finds that these acts, although occurring after formal charges had been brought, demonstrate efforts by Respondent to rectify the consequences of his misconduct.[87] Thus, we apply some weight to this factor in mitigation.[88]

*Character or Reputation—9.32(g):* The Hearing Board heard reputation testimony from Sak and from one character witness called by Respondent, Mark G. Mayberry. Sak testified that Respondent was very generous to clients, often waiving fees and costs when they could not afford them. He also said he believes Respondent is an honest attorney. Mayberry testified that he has worked at BLO for the past fourteen years and has known Respondent for fifteen. During this time, he has seen Respondent give

substantial sums of money to his church, including donating vehicles to single mothers. He has always known Respondent to be honest personally and professionally. We deem this a factor in mitigation.

*Mental Disability or Chemical Dependency Including Alcoholism or Drug Abuse— 9.32(i):* Respondent contends that in 2011 he began experiencing post-acute withdrawal syndrome ("PAWS"), the process the brain undergoes when recovering from physical damage caused by substance abuse, after he completed rehabilitation for a chemical dependency, and thus urges the application of ABA Standard 9.32(i). This standard provides that a mental disability or chemical dependency is a mitigating factor when:

> (1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability;
>
> (2) the chemical dependency or mental disability caused the misconduct;
>
> (3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and
>
> (4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.[89]

The comment to ABA *Standard* 9.3 cautions

> Issues of physical and mental disability or chemical depencency [sic] offered as mitigating factors in disciplinary proceedings require careful analysis. Direct causation between the disability or chemical dependency and the offense must be established. If the offense is proven to be attributable solely to a disability or chemical dependency, it should be given the greatest weight. If it is principally responsible for the offense, it should be given very great weight; and if it is a substantially contributing cause of the offense, it should be given

---

87. *See In re Fischer,* 89 P.3d 817, 821 (Colo. 2004) (deeming it the "better policy to allow a good faith effort to make restitution to be considered in mitigation in order both to encourage lawyers to reduce the injuries they have caused and help insure recognition of the wrongfulness of their conduct").

88. *Id.* ("Restitution prior to the initiation of disciplinary proceedings therefore presents the clearest case for mitigation, while restitution later in the proceedings presents a weaker case."); *see also* ABA Standard 9.32 cmt.

89. ABA *Standard* 9.32(i).

great weight. In all other cases in which the disability or chemical dependency is considered as mitigating, it should be given little weight.

Respondent retained Dr. Wahl to conduct an independent medical evaluation. Dr. Wahl testified that he evaluated Respondent on two occasions using a generally accepted methodology, including taking a pointed history of Respondent, performing a mental status exam, and interviewing Respondent's significant other. Dr. Wahl did not feel it necessary to review Respondent's medical records or interview Respondent's colleagues.[90] Dr. Wahl diagnosed Respondent with PAWS and a co-occurring condition, likely bipolar disorder, which complicated his substance abuse disorder. Dr. Wahl opined that Respondent suffered from PAWS beginning in July 2011, and continuing well into summer and early fall 2012. According to Dr. Wahl, while a person's brain is recovering from an addiction, that person may experience a constellation of symptoms after completing detoxification, including an aggravation of an underlying co-occurring condition, irritability, poor concentration, poor judgment, and difficulty in sleeping. Respondent recalled experiencing many of these symptoms in summer 2012, and they were confirmed to Dr. Wahl by Respondent's significant other. During periods of stress, like three back-to-back jury trials, these symptoms can also be aggravated, according to Dr. Wahl, and can last as long as one year post-detoxification.

Respondent offered evidence that PAWS and his co-occurring condition were substantial contributing causes of his misconduct. Dr. Wahl indicated that he was familiar with Respondent's misconduct, although not the specific allegations, and he opined that Respondent's PAWS and co-occurring condition complicated his functioning during this timeframe and were directly tied to his earlier recovery from opiate abuse. Although Dr. Wortzel testified that Dr. Wahl's report on this issue was "speaking in terms of generalities," Dr. Wortzel did not offer any contrary evidence as to whether PAWS or the co-occurring condition contributed to Respondent's misconduct.

Dr. Wahl opined that Respondent has undergone a meaningful and sustained period of successful rehabilitation and that he was able to corroborate this recovery by speaking to Respondent's significant other. Dr. Wahl further opined that Respondent's recovery arrested his misconduct and it was unlikely the misconduct would reoccur. He believes Respondent desires to practice law ethically and is motivated to continue treatment. The Hearing Board believes that Dr. Wahl's testimony indicates Respondent's disability was "a substantially contributing cause of the offense," such that it should be given great weight in mitigation.

### Analysis Under ABA *Standards* and Case Law

The Hearing Board is aware of the Colorado Supreme Court's directive to exercise discretion in imposing a sanction and to carefully apply aggravating and mitigating factors,[91] mindful that "individual circumstances make

---

90. Dr. Wahl was qualified as an expert witness in the areas of general psychiatry and addiction. *See* Ex. S–41. The People retained Dr. Wortzel not to evaluate Respondent but to rebut the methodology Dr. Wahl used in evaluating Respondent. Dr. Wortzel was qualified as an expert witness in the areas of psychiatry, neuropsychiatry, and forensic psychiatry. *See* Ex. S–42. Dr. Wortzel opined that Dr. Wahl did not follow the accepted procedure when conducting an examination of a patient in a medical-legal setting. According to Dr. Wortzel, in adversarial litigation settings it is customary to rely on—and verify—collateral sources of information in order to determine whether the person involved in the lawsuit is accurately reporting information. In Dr. Wortzel's opinion, Dr. Wahl did not consider sufficient collateral sources and, at the very least, should have reviewed Respondent's medical records. Although Dr. Wahl did not do so, he was confident that it was unnecessary under the circumstances and that he had all the information he needed to accurately diagnose his conditions. He also indicated that he took into consideration any judgment bias. The Hearing Board finds Dr. Wahl's opinions sufficient to demonstrate that Respondent was affected by PAWS and a co-occurring condition.

91. *See In re Attorney F.,* 285 P.3d 322, 327 (Colo. 2012); *In re Fischer,* 89 P.3d at 822 (finding that a hearing board had overemphasized the presumptive sanction and undervalued the importance of mitigating factors in determining the needs of the public).

extremely problematic any meaningful comparison of discipline ultimately imposed in different cases."[92] Though prior cases are helpful by way of analogy, a hearing board should determine the appropriate sanction for a lawyer's misconduct on a case-by-case basis.

The Colorado Supreme Court has imposed a wide range of sanctions in disciplinary cases involving dishonest conduct and failure to communicate.[93] For example, in *People v. Waitkus*, the Colorado Supreme Court publicly censured an attorney who accepted a settlement on behalf of his client without the authority to do so.[94] Waitkus then altered the amount of the check and changed the designated payee on the check from his client *and* himself to his client *or* himself.[95] The Colorado Supreme Court reasoned that because his client was not injured, reprimand was warranted.[96] In addition, the presence of significant mitigating factors, including no prior discipline during a thirteen-year career and personal and emotional problems, persuaded the Colorado Supreme Court that a suspension was unwarranted. On the other hand, in *People v. Smith*, the Colorado Supreme Court suspended an attorney for one year and one day for making multiple misrepresentations to a client that his case was set for trial and then had settled, paying his client fake settlement money, and manufac-

turing a settlement letter.[97] The Colorado Supreme Court might have considered a shorter period of suspension but for the attorney's significant prior discipline, dishonest and selfish motive, and commission of multiple offenses.[98]

In this case, there are considerable mitigating factors, including personal and emotional problems, a mental disability, and an absence of prior discipline. We recognize that our task in considering mitigators is to "gauge the level of danger that an attorney poses to the public."[99] Significant mitigating factors in this case convince us that a lengthy suspension is not warranted. Probation is fitting here because the evidence demonstrates that Respondent has recovered from his disability, is unlikely to harm the public, and is able to conform to standards of practice.[100] Thus, we conclude that a sixty-day suspension, all stayed upon the successful completion of a one-year period of probation with conditions, is appropriate under the circumstances.

## V. CONCLUSION

Respondent's lack of communication, failure to obtain his client's informed consent to settle in writing, and deceitful conduct toward his client violated Colo. RPC 1.2(a), 1.4(a) and (b), 1.8(g), and 8.4(c). Respondent

**92.** *In re Attorney F.*, 285 P.3d at 327 (quoting *People v. Rosen*, 198 P.3d 116, 121 (Colo.2008)).

**93.** *See, e.g., In re Pautler*, 47 P.3d 1175, 1184 (Colo.2002) (imposing three-month stayed suspension when an attorney engaged in intentional deceitful conduct, where significant mitigating factors were present); *People v. Gibson*, 991 P.2d 277, 279 (Colo.1999) (suspending an attorney for thirty days where the attorney deceived his client to hide the fact that the attorney had neglected his client's tort claim); *People v. Johnston*, 955 P.2d 1051, 1052 (Colo.1998) (approving a public censure where the attorney sent a misleading letter to his client a month after the client's case had been dismissed leading the client to believe his case was still pending, where minor prior discipline was present); *People v. Woodrum*, 911 P.2d 640, 641 (Colo.1996) (approving public censure where an attorney neglected a legal matter, commingled client funds, and misrepresented to her client that a favorable plea bargain had been reached when in fact it had never been offered, where three mitigating factors were present); *People v. LaSalle*, 848 P.2d 348, 350 (Colo.1993) (suspending an attorney for thirty days for inac-

tion on his client's case for over two years, as well as for multiple misrepresentations to his client that he would file a motion, where significant mitigating factors were present).

**94.** 962 P.2d 977, 978 (Colo.1998).

**95.** *Id.*

**96.** *Id.*

**97.** 888 P.2d 248, 248–49 (Colo.1995).

**98.** *Id.* at 250.

**99.** *In re Cleland*, 2 P.3d 700, 705 (Colo.2000) ("The reason we consider mitigating factors at all is so we may gauge the level of danger that an attorney poses to the public and, ideally, to arrive at a disciplinary sanction that adequately balances the seriousness of the danger against the gravity of the misconduct.").

**100.** *See* C.R.C.P. 251.7(a)(1)-(3).

caused actual and potential harm to his client. Yet sanctions for Respondent's misconduct should be tempered because the evidence demonstrates that his mental disability substantially contributed to his misconduct. Continued treatment will allow Respondent to resume his professional duties without placing the public at risk. Taking into account the mitigating and aggravating factors, the Hearing Board determines that Respondent should be suspended for sixty days, all stayed upon the completion of a one-year period of probation with conditions.

## VI. *ORDER*

The Hearing Board therefore **ORDERS:**

1. **MARC F. BENDINELLI, attorney registration number 28425, is SUSPENDED FOR SIXTY DAYS, ALL STAYED UPON THE SUCCESSFUL COMPLETION OF A ONE-YEAR PERIOD OF PROBATION.** The **PROBATION SHALL** take effect only upon issuance of an "Order and Notice of Probation." [101]

2. Respondent **SHALL** comply with the following conditions of probation:

   a. During his probation, Respondent shall continue therapeutic treatment with Jonathan DeCarlo or another licensed therapist (approved by the People). The frequency of therapy shall be determined by Respondent's treating therapist. Respondent shall comply with his treating therapist's treatment recommendations, including taking any medication approved or prescribed by the therapist or physician. Respondent shall sign any releases necessary to enable the People to confirm his compliance with this condition.

   b. No further violations of the Colorado Rules of Professional Conduct.

3. The parties **SHALL** file any post-hearing motion or application for stay pending appeal with the Hearing Board **on or before Monday, June 9, 2014.** No extensions of time will be granted. Any response thereto **SHALL** be filed within seven days, unless otherwise ordered by the PDJ.

4. Respondent **SHALL** pay the costs of these proceedings. The People **SHALL** file a "Statement of Costs," **within fourteen days of the date of this order.** Any response thereto **SHALL** be filed within seven days, unless otherwise ordered by the PDJ.

---

101. In general, an order and notice of sanction will issue thirty-five days after a decision is entered pursuant to C.R.C.P. 251.19(b) or (c). In some instances, the order and notice may issue later than thirty-five days by operation of C.R.C.P. 251.27(h), C.R.C.P. 59, or other applicable rules.